UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| ALTON JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 12 CV 50438 |
| | ) Honorable Iain D. Johnston |
| CAROLYN W. COLVIN, | ) Magistrate Judge |
| Secretary of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

The Claimant, Alton Jones, (the "Claimant") brings this action under 42 U.S.C. §405(g), seeking reversal or remand of the decision by Respondent, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying the Claimant's application for disability insurance benefits under Title II of the Social Security Act ("SSA"). This matter is before the Court on cross-motions for summary judgment. (Dkt. # # 8, 17).

The Claimant argues that the Commissioner's decision denying his application for benefits should be reversed or remanded for further proceedings because the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence and is contrary to law. The Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence. For the reasons below, the Commissioner's motion for summary judgment (Dkt. #17) is denied, and the Claimant's motion (Dkt. #8) is granted. The Court remands

---

[1] Commissioner Carolyn W. Colvin has been automatically substituted as the Defendant-Respondent pursuant to Federal Rule of Civil Procedure 25(d).

this matter to the Social Security Administration ("SSA") for further proceedings
consistent with this Memorandum Opinion and Order.

# I. BACKGROUND

## A. Procedural History

The Claimant filed an application for disability on July 30, 2009, alleging a
disability onset date of May 31, 2005.  R. 145-154.  On November 18, 2009, the
application was initially denied, and was denied upon reconsideration on April 12,
2010.  R. 67-74; 80-85.  On May 17, 2010, the Claimant filed a request for a hearing.
R. 22.  The ALJ granted this request and conducted a hearing on April 5, 2011 in
Oak Brook, Illinois.  *Id.*   The Claimant and Vocational Expert ("VE") Cheryl R.
Hosieth testified at the hearing.  R. 41-60.

On May 25, 2011, the ALJ issued a decision denying the claim for benefits.
R. 22-33.  The Claimant requested the Appeals Council review the ALJ's decision,
but on February 8, 2011, the Appeals Council denied the review, thereby making
the ALJ's decision final.  R. 1-6; 20 C.F.R. § 404.927.  Shortly thereafter, the
Claimant filed this appeal pursuant to 42 U.S.C. §405(g).

## B. Hearing Testimony

1. April 5, 2010 Hearing

a. Claimant

At his administrative hearing, the Claimant testified that he was a single
male who lived with his parents.  He stated that he had six children who did not

live with him, but lived in close proximity to his parent's apartment. R. 42-43; 53. The Claimant testified that he regularly sees his children on the weekends. R. 53.

When asked about his work experience, the Claimant testified that he had not been employed at any job longer than four months since May 31, 2005. R. 43-44. He then described his work experience prior to May 2005. He stated he was previously employed in the shipping department at a woodworking company and also worked as a security guard and maintenance repairman at a hotel and a dietary aide at a nursing home. R. 44-47.

The Claimant testified that after May 31, 2005, he could not maintain employment because of his mental health problems. He stated that he suffered from anxiety, paranoia, and low self-esteem. He also testified that he experienced "flashbacks" of being molested as a child. R. 54. He explained that he had difficulties concentrating and getting along with others and occasionally experienced crying spells. R. 48-55. The Claimant testified that he sought treatment for his mental health issues in the mid-to-late '90's and also testified that he received treatment for alcohol and drug abuse around this time. R. 49.

When asked about his current physical capabilities, the Claimant stated that he could walk a short distance, lift one hundred pounds, climb stairs and reach over his head without difficulty. R. 50. He also testified that he was able to drive, do household chores, and go to the grocery store. R. 50.

With regard to his current alcohol and drug use, the Claimant testified that he consumed alcohol and marijuana infrequently. R. 49-50. When asked what he

3

believed his biggest issue was that prevented him from securing long-term employment, the Claimant stated that he had "trouble taking orders and directions from people . . ." and had a difficult time getting along with others. R. 55. When asked what he believed would happen if he got a job where he could work independently, the Claimant testified that he did not think he would be successful because he had "a hard time staying focused . . ." and "a hard time finishing things." R. 56.

### b. Vocational Expert

At the administrative hearing, Cheryl Hoiseth – a vocational expert – testified that she reviewed the exhibits and had heard the Claimant's testimony regarding his work history. R. 57. When asked whether an individual with the Claimant's characteristics and impairments could perform a job in the current economy, Ms. Hoiseth answered affirmatively. R. 58. She stated that the Claimant could perform "medium, unskilled" jobs and specifically noted that the Claimant could work as a janitor, hand packager, or hospital food service worker. R. 58. She also testified that if the Claimant was limited to light work, he could perform jobs as a housekeeping cleaner or cafeteria attendant. R. 58. The Claimant's attorney questioned Ms. Hoiseth about the amount of supervisor interaction that was required for the aforementioned jobs. She testified that instruction would only need to be given "periodically, maybe once or twice or month." R. 60.

## C. Medical Record Evidence

Because the issues raised in the Claimant's appeal relate to (1) whether the ALJ made an erroneous Residual Functional Capacity assessment and (2) whether the ALJ made an accurate credibility determination regarding Claimant's subjective complaints about his medical condition, only the medical records relating to these issues will be addressed.

1. Medical Record Evidence:  January  2005 – December 2009

The first medical record relating to the Claimant's mental illnesses is dated on January 6, 2005.  R. 491.  This document states that the Claimant arrived at the Ecker Center for Mental Health ("Ecker Center") to see psychiatrist Alicia Martin "after four months of absence."  R. 491.  The document indicates that the Claimant gave a number of excuses as to why he cancelled and failed to show up for his prior appointments and states that the Claimant was diagnosed with major depression, history of alcohol and cannabis dependence, and antisocial personality disorder.  R. 491.  Dr. Martin's progress notes indicate that on January 6, 2005, the Claimant denied feelings of "hopelessness or helplessness or anehenodia" and his "expressed judgment was good."  R. 491.  Dr. Martin renewed the Claimant's prescription for Prozac and informed the Claimant that his medication needed to be taken consistently for it to be effective.  R. 491.  She ordered the Claimant to return to the Ecker Center in 4-6 weeks.  R. 491.

Despite Dr. Martin's orders, the next medical record concerning the Claimant's mental health is dated May 27, 2009.  R. 480.  At this time, the Claimant had a comprehensive mental health assessment at the Ecker Center.  R.

480.  This assessment diagnosed the Claimant with major depressive disorder.  R.

480.  The document explains that the Claimant came to the Ecker Center and

reported "life-long difficulties with depression and anger."  R. 475.  The document

indicates that the Claimant stated he "was arrested on May 23, 2009 for an assault

on a neighbor" but he denied ever becoming "physical with the other person."  R.

475.  This document also indicates that the Claimant had a history of legal

problems, but believed he was being "targeted by Elgin police and was arrested

multiple times without reason."  R. 476.   The document states that Claimant

reported "some recent (5-26-09) homicidal ideation" but he had "no intent to harm

anyone."  R. 475.  The assessment also indicates that the Claimant reported a loss

of interest in many activities, but that "he was in contact with friends on a regular

basis."  R. 476.  The document states the Claimant was oriented and his memory

was good.  R. 478.  The assessment referred the Claimant for a psychiatric

evaluation with Dr. Alicia Martin.  R. 479; 481.

Based on this referral, the Claimant had a psychiatric evaluation on June 9,

2009.  R. 420-423.  Dr. Alicia Martin's progress notes indicate that the Claimant

was a client of the Ecker Center in September 2004, but was not consistent with his

treatment.  R. 422.  The progress notes state that the Claimant described signs and

symptoms of major depression and presented "a history of irritability with physical

aggression."  R. 422.  However, Dr. Martin noted that the Claimant "denied feeling

hopeless, helpless, or worthless" and his "judgment was good."  R. 422.

She prescribed the Claimant Prozac and Risperdal and scheduled a follow-up appointment in two to three weeks. R. 422.

On June 23, 2009, the Claimant had his follow-up appointment with Dr. Martin. R. 424. The progress notes indicate that the Claimant reported improvement with his condition. R. 424. Specifically, the document states that the Claimant subjectively noticed that he did not have as much anger and had "no complaints of depression, anxiety, panic attacks, psychotic symptoms, severe mood swings, or hypomanic episodes." R. 424. Dr. Martin determined that the Claimant would continue on the same dose of his medication and ordered the Claimant to return in one month. R. 424.

On August 6, 2009, the Claimant visited Dr. Martin for his follow-up appointment. At this time, the Claimant stated that was benefitting from his medicine, but had noticed some signs of sadness. R. 426. Dr. Martin's progress notes indicate that the Claimant was "calm, cooperative and soft spoken . . . and was coherent and goal directed." R. 426. The notes also state that Dr. Martin informed the Claimant that she would be leaving the Ecker Center, and the Claimant agreed to see another psychiatrist at the Ecker Center. R. 426.

On August 20, 2009, the Claimant visited the Ecker Center and met with medical assistant Benjamin Harris. R. 427. Harris' progress notes indicate that the Claimant stated he was having trouble making it through the day and reported "nearly constant worry." R. 427. At this time, Harris gave the Claimant a

Cognitive Restructuring Worksheet and instructed him to complete a behavioral goals worksheet for his appointment. R. 427.

The Claimant had an individual therapy session with Harris on August 24, 2009. R. 428. The progress notes from this session indicate that the Claimant "reported having accomplished his goals from the previous session" and "reported that he found completing the Worksheets to be helpful with regard to monitoring his thoughts and discovering what is upsetting him." R. 428. The Claimant was scheduled for another session the following week. R. 428.

The next medical records are from the Ecker Center's psychiatrist Walter Pedemonte and are dated October 5. 2009. R. 484. These notes indicate that the Claimant came to Dr. Pedemonte to obtain a refill of his prescription medication. R. 484. Dr. Pedemonte noted that the Claimant was "co-operative," "psychomotorally stable" and "oriented to time, place, and person." R. 484. Dr. Pedemonte refilled the Claimant's prescription and ordered a follow-up appointment in eight weeks. R. 484.

On October 6, 2009, the Claimant had a psychological examination for the Bureau of Disability Determination Services. R. 435-440. This examination was performed by Licensed Clinical Psychologist Barbara F. Sherman. The exam notes state that the Claimant was 32-years-old at the time of the exam and was able to drive himself to the examination site without difficulties. The examination records indicate that the Claimant reported that he had been "going to the Ecker Center off and on for a number of years and was unable to keep work because of his explosive

disorder and major depression." R. 435. The Claimant stated he began receiving counseling through the Ecker Center after "he was hospitalized at Saint Joseph's at age 18." R. 436. He reported that when he was 18 "he heard voices . . . but this was after being overmedicated . . . " and that "when the medications were changed he stopped having that experience." R. 436. The October 6, 2009 examination records note that the Claimant had adequate vision and hearing, but reported difficulty sleeping. R. 436. When addressing the Claimant's social skills, Dr. Sherman reported that the Claimant's "socialization skills were reportedly unproblematic . . . " and that the Claimant "saw himself as getting along adequately with his friends and s[aw] his children often." R. 437. Sherman also noted the Claimant "acknowledged that he got angry easily . . . " and during times of anger would "yell, break furniture, punch the wall and throw glasses." R. 437. Dr. Sherman determined that the Claimant's attention, concentration, and memory were adequate. R. 438. She also concluded that the Claimant's judgment was "generally adequate" and that the Claimant did not present signs of psychosis. R. 438. She concluded by finding that the Claimant "would not be able to manage his funds if he was eligible for benefits because of his history of substance abuse." R. 440.

On November 8, 2009, the Claimant had a mental residual functional capacity assessment performed by psychiatrist Lionel Hudspeth, a State agency consultant. R. 460-462. This assessment indicates that the Claimant's ability to understand both short and detailed instructions was not significantly limited by his illnesses. R. 460. The assessment also states that the Claimant was able to

"sustain an ordinary routine without special supervision" and was not significantly limited in his ability to "make simple work-related decisions." R. 460. Dr. Hudspeth determined the Claimant was not significantly limited in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and could perform at a consistent pace without an unreasonable number and length of rest periods." R. 461. With respect to his ability to interact with others, Dr. Hudspeth found the Claimant was not significantly limited in his "ability to ask simple questions or request assistance" and his "ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness." R. 461. Dr. Hudspeth concluded that the Claimant's "long history of behavioral/conduct/criminal actions and difficulty with others," required the Claimant to work a job where he would have "no contact with the public and minimal contact with coworkers and supervisors." R. 462.

On November 30, 2009, the Claimant returned to the Ecker Center to see Dr. Pedemonte for a follow-up appointment. R. 502. Dr. Pedemonte's progress notes indicate that the Claimant was "psychomotorally stable" and his "insight and judgment [were] moderate." R. 502. He ordered the Claimant to return for a follow-up appointment in eight weeks.

On December 30, 2009, the Claimant returned to visit Dr. Pedemonte for a follow-up appointment. R. 501. At this time, Dr. Pedemonte found the Claimant to be "psychomotorally retarded" and found his "attention, concentration, and

calculation poor." R. 501. He scheduled a follow-up appointment in eight weeks. R. 501.

2. Medical Record Evidence January 2010 – December 2010

On January 12, 2010, the Claimant had his mental health reassessed at the Ecker Center. R. 473. The reassessment notes indicate that the Claimant was returning for individual therapy sessions because he was continuing "to experience significant impairment in psychosocial functioning . . ." R. 474. The document states that the Claimant reported continued difficulty in "coping with symptoms of depression and managing thoughts/behaviors related to anger." R. 474. The assessment recommended that the Claimant continue to receive individual therapy.

Pursuant to this recommendation, the Claimant saw Benjamin Harris for an individual therapy session on January 21, 2010. R. 518. The progress notes indicate that the Claimant "demonstrated success" in understanding the consequences of his anger and was receptive to the suggestions Harris offered the Claimant to control his anger. R. 518. The Claimant's next individual therapy session was scheduled for January 26, 2010. R. 518.

The January 26, 2010 progress notes indicate that the Claimant and Harris discussed a questionnaire that Harris was given for the Claimant's Social Security claim. R. 519. The notes state that the Claimant reported experiencing difficulties because he was constantly arguing with his girlfriend. R. 519. At this time, the Claimant stated that he feared he would do something to harm his girlfriend if their fights continued. The progress notes indicate that Harris and the Claimant

discussed a plan to minimize the fighting and avoid aggressive behavior and that the Claimant reported "confidence in his ability to follow through with this plan when he speaks with his girlfriend." R. 519.

On February 3, 2010, the Claimant returned for another individual therapy session with Harris. The progress notes indicate that the Claimant had completed all of his goals and stated that the arguments with his girlfriend had ceased. The Claimant reported that he had "gone out to dinner twice during the week with his girlfriend and friends" and "reported improved mood and high motivation." R. 520. At this time, Harris instructed the Claimant to review therapy materials before his next session. R. 520.

At the Claimant's next therapy session on February 17, 2010, he "reported having a good week" and "reported several behavioral changes (e.g., spending time out of his room interacting with parents, positive conversations with girlfriend, positive activities) that he related resulted in improvements in mood." R. 521.

The Claimant's next individual therapy session was on February 23, 2010. R. 522. The progress notes indicate that the Claimant was again having difficulties because of negative interactions with his girlfriend. R. 522. The progress notes state that the Claimant was reminded to engage in relaxation exercises that were discussed in previous therapy sessions. Another individual therapy session was scheduled. R. 522.

On March 1, 2010, the Claimant saw Dr. Walter Pedemonte to obtain a refill for his prescription medications. Dr. Pedemonte's progress notes indicate that the

Claimant was "psychomotorally stable" and his "mood and affect were fair." R. 523. Dr. Pedemonte refilled the Claimant's prescription and ordered him to return in eight weeks. R. 523.

On March 4, 2010, the Claimant met with Benjamin Harris for an individual therapy session. At this time, the Claimant reported that he had experienced "suicidal ideation," but stated "he was able to think of a reason not to harm himself (i.e., his children)" and denied continued suicidal ideation. R. 524. The progress notes indicate that the Claimant and Harris formed a safety plan for the next time the Claimant experienced suicidal thoughts and another therapy session was scheduled. R. 524.

In March 2010, the Claimant had another three therapy sessions with Benjamin Harris. During this time, the Claimant reported that many of his symptoms had not shown improvement. R. 526. Specifically, the Claimant complained about "continued difficulties with motivation to increase his activity level and to apply for jobs to meet court requirements." R. 528. At this time, the progress notes indicate that Claimant "appeared to demonstrate an ability to realize mistakes in his thinking that are impeding goal completion," and agreed to move his therapy sessions to every other week to give him time to work toward his goals. R. 528.

The Claimant's next therapy session was on April 14, 2010. R. 529. The progress notes indicate that at this time he reported difficulties in completing his goals. R. 529. The progress notes state that the Claimant was engaging in negative

thought patterns and "repeatedly verbalized excuses" for such thoughts.  R. 529.
Harris noted that at the end of the session, the Claimant stated he would "try not to give up so easily."  R. 529.

The April 19, 2010 progress notes indicate that the Claimant reported spending more time with his girlfriend.  R. 530.  At this session, Harris reviewed the Claimant's Relapse Prevention Plan ("the Plan") and encouraged the Claimant to review the Plan before his last therapy session.  R. 530.

On April 28, 2010, the Claimant had his last individual therapy session.  R. 532.  The progress notes indicate that the Claimant reported that "he thinks he has made positive changes with regard to awareness of problem areas (i.e., negative thinking/behavior patterns, anger expression) as a result of participating in individual therapy."  R. 532.  At this time, Harris informed the Claimant he would be transferred to a medications-only treatment plan.  R. 532.  In his discharge notes, Harris stated that the Claimant was "stable" and had "shown improvement over the course of individual therapy with regard to management of negative emotional responses."  R. 533.

On August 11, 2010, the Claimant saw Dr. Walter Pedemonte for another psychiatric evaluation.  R. 536-538.  At this time, Dr. Pedemonte noted that the Claimant was "psychomotorally stable" and his thought process was "within normal limits."  R. 537.  He determined that the Claimant was doing well with his medication and recommended individual psychotherapy and pharmacotherapy.  R. 538-39.

The Claimant's last medical records are from December 1, 2010. On that date, the Claimant saw Dr. Pedemonte for a follow-up appointment. R. 540. At this time, the progress notes indicate that the Claimant was psychomotorally stable. R. 540. Dr. Pedemonte determined that the Claimant's judgment and insight were improving and ordered him to return in three months. R. 540.

## D. ALJ's Decisions and Appeals Council Review

On May 25, 2011, the ALJ issued her decision and denied the Claimant's application for benefits. R. 24. In the decision, the ALJ first determined that the Claimant met the insured status requirements of the SSA through June 30, 2009. Next, the ALJ found that the Claimant had not engaged in substantial gainful activity since May 31, 2005. R. 24. Third, the ALJ found that the Claimant had the following severe impairments: major depressive disorder; explosive disorder; posttraumatic stress disorder; and a history of alcohol and marijuana abuse. R. 24. Fourth, the ALJ found that these impairments did not meet or equal one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1. R. 25. Fifth, the ALJ found that the Claimant had a residual functional capacity "to perform a full range of work at all exertional levels but with the following non-extertional limitations: the Claimant should come into no contact with the public for work related purposes, but can have occasional contact with co-workers and supervisors." R. 26. The ALJ determined that the Claimant was limited to unskilled three to four step simple, repetitive, and routine tasks. R. 26. In making the residual functional capacity determination, the ALJ relied upon the opinions of psychiatrist Barbara

Sherman and the State agency medical consultants, and gave little weight to the Claimant's former psychiatrist, Dr. Walter Pedemonte, finding that the medical record did not support some of his opinions regarding the Claimant's limitations.  R. 29-30.  The ALJ also considered the Claimant's testimony, but noted that the Claimant was not "fully credible" since some of the Claimant's asserted limitations were contradicted by evidence in the record.  R. 27.  Thus, the ALJ determined that the Claimant was not disabled.  R. 32.

The Claimant appealed the ALJ's decision, but on February 8, 2011, the Appeals Council denied the Claimant's request for review.  R. 1.  This denial made the decision of the ALJ a final administrative decision by the Commissioner.  *See* 20 C.F.R. § 404.927.

## II. LEGAL STANDARDS

A. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing."  42 U.S.C. §405(g).  This much is clear regarding the standard of review. If supported by substantial evidence, the Commissioner's factual findings are conclusive.  42 U.S.C. §405(g).  If the Appeals Council denies a request for review, the ALJ's decision becomes the Commissioner's final decision, reviewable by the district court.  *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).  But beyond these axiomatic statements, the courts have provided seemingly conflicting guideposts.

At one end of the spectrum, court opinions have held that the standard of review is narrow. *See Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (review is "extremely limited"). The district court's review is limited to determining whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standard in reaching the decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence exists if there is enough relevant record evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Indeed, on review, the courts will give the decision a commonsensical reading and not pick nits. *Rice v. Barnhart*, 389 F.3d 363, 369 (7th Cir. 2004). Moreover, a decision need not provide a complete written evaluation of every piece of testimony and evidence. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). If reasonable minds could differ concerning whether a claimant is disabled, then the court must affirm so long as the decision is adequately supported. *Elder*, 529 F.3d at 413.

At the other end of the spectrum, courts, including the Seventh Circuit, have been careful to emphasize that the review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). For example, a "mere scintilla" is not substantial evidence. *Id.* Instead, a reviewing court should conduct a critical

review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2002); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *Sarchet v. Carter*, 78 F.3d 305, 307 (7th Cir. 1996).[2] And, unlike most civil litigation in which a decision can be affirmed on any basis in the record, federal courts cannot do so in Social Security appeals. *Compare Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("The *Chenery* doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.") *with Brosted v. Unum Life Ins. Co.*, 421 F.3d 459, 467 (7th Cir. 2005) ("We can affirm on any basis in the record"). Therefore, the Commissioner's counsel cannot build for the first time on appeal the necessary accurate and logical bridge. *See Parker*, 597 F.3d at 925; *Toft v. Colvin*, No. 08-C-2861, 2013 U.S. Dist. LEXIS 72876 *21 (N.D. Ill. 2013) ("The court's review is

---

[2] To further show the seeming conflict, scores of cases rely upon the "logical bridge" analysis and language to remand decisions to the Commissioner. *See, e.g. Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). But the "logical bridge" analysis was never meant to compel a hypercritical approach. *Mueller v. Astrue*, 860 F.Supp.2d 615, 619 (N.D. Ill. 2012). Indeed, the Seventh Circuit has provided the following pedestrian explanation of how an ALJ's decision establishes a logical bridge: "[T]he ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger*, 516 F.3d at 544.

limited to the reasons and logical bridge articulated in the ALJ's decision, not the post-hoc rational submitted in the Commissioner's brief."). An exception to the *Chenery* doctrine is the harmless-error doctrine, which allows a court to affirm if the outcome on remand is foreordained. *See Osmani v. INS,* 14 F.3d 13, 15 (7th Cir. 1994) (harmless error does not require remand "when it is clear what the agency's decision has to be"); *Sahara Coal Co. v. Office of Workers' Compensation Programs*, 946 F.2d 554, 558 (7th Cir. 1991); *see also Parker*, 597 F.3d at 924.

B. Disability Standard

Disability insurance benefits are available to a claimant who can establish that he is under a "disability" as defined in the SSA. *Liskowitz v. Astrue*, 559 F.3d 736, 739-740 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). An individual is under a disability if he is unable to perform his previous work and cannot, considering his age, education and work experience, participate in any gainful employment that exists in the national economy. 42 U.S.C. §423 (d)(2)(A). Gainful employment is work usually done for pay or profit, regardless of whether a profit is realized. 20 C.F.R. §404.1572(b).

The ALJ uses a five-step analysis to determine whether a claimant is disabled. 20 C.F.R. §404.1520(a)(4)(i – v). Under this analysis, the ALJ must inquire in the following order: (1) whether the claimant is engaged in substantial

gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's severe impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; meaning whether the claimant can still work despite the claimant's physical and mental limitations, which is referred to as the claimant's residual functional capacity ("RFC"); and (5) whether the claimant is capable of performing work in light of the claimant's age, education and work experience. *Id.*; *see also Liskowitz*, 559 F.3d at 740. After the claimant has proved that he cannot perform his past relevant work due to the limitations, the Commissioner carries the burden of showing that a significant number of jobs exist in the national economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

A. Contentions of the Parties

In asserting that the ALJ's decision was not supported by substantial evidence, the Claimant contends that the matter should be remanded for two (2) reasons. First, the Claimant contends that the ALJ erred in her residual functioning capacity ("RFC") assessment and therefore presented Vocational Expert, ("VE") Cheryl Hoiseth an incomplete hypothetical. Essentially, the Claimant argues that the ALJ failed to incorporate his inability to concentrate and his inability to control his anger in the RFC assessment. Because of this, the Claimant contends the VE was presented an incomplete hypothetical. Dkt. #8-2, p. 4-9. Next, the Claimant argues that the ALJ erred in finding the Claimant's

subjective complaints were not fully credible. Dkt. #8-2, p. 10. Specifically, the Claimant contends the ALJ placed too much emphasis on his ability to care for his children and the gap in his treatment when she determined that the Claimant's subjective complaints were contradictory to evidence in the record. Dkt. #8-2, p. 10-11.

The Commissioner argues that the ALJ's decision is supported by substantial evidence and should be affirmed. The Commissioner claims the ALJ considered all of the Claimant's limitations when she made her RFC assessment and therefore presented a complete hypothetical to the VE. The Commission also contends that the ALJ did not err when she determined that the Claimant's subjective complaints were not fully credible.

B. Analysis

1. The ALJ Considered all of the Claimant's Limitations when She Determined the Claimant's RFC

The Claimant challenges the ALJ's RFC determination on a number of grounds. Specifically, he argues that the RFC determination did not incorporate his limitations in concentration and anger management and this means the RFC is not supported by substantial evidence.

At step four, an ALJ must determine a claimant's RFC, or "what an individual can do despite his or her limitations." S.S.R. 96-8p. The RFC represents "the maximum a person can do – despite his limitations – on a regular and continuing basis, which means roughly eight hours a day for five days a week." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quotation marks and citations

omitted). In determining a Claimant's RFC, the ALJ must consider both medical and non-medical evidence in the record. *Dixon v. Massanari*, 270 F. 3d 1171, 1178 (7th Cir. 2001). While an ALJ "need not mention every piece of evidence in the record when forming the RFC determination, she must provide 'an accurate and logical bridge' between the evidence and the conclusion that the claimant is not disabled." *Simms v. Astrue*, 599 F. Supp. 2d 988, 1000 (7th Cir. 2009) (quoting *Zblewski v. Astrue*, 302 Fed. Appx. 488, 492-93 (7th Cir. 2008)). Moreover, an RFC assessment "must include a narrative discussion which describes how the objective and subjective evidence supports each of the ALJ's conclusions . . . " and "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* (quoting SSR 96-8p).

In this case, the ALJ concluded that the Claimant had the RFC to perform unskilled, three-to-four step, simple repetitive, routine tasks with the caveat that he should not come into contact with the public and should only have limited contact with coworkers and supervisors. R. 57-58. The Claimant argues this assessment is not supported by substantial evidence because the ALJ failed to incorporate his limitations in concentration and anger management into the RFC. After reviewing both the decision and record, the Court disagrees. In this case, the ALJ built the necessary bridge between the record evidence and her conclusions regarding the Claimant's RFC.

To begin, the ALJ's decision clearly states her determination regarding the Claimant's RFC was based on the "record as a whole . . . the claimant's testimony,

objective, evidence and medical opinions . . . ." R. 31.  With respect to the

Claimant's limitations in concentration, the ALJ concluded that the Claimant had

"moderate limitation in his ability to maintain concentration, persistence, or pace."

R. 30.  In reaching this conclusion, the ALJ provided a detailed narrative to explain

how the record evidence supported her finding and to explain the inconsistencies

within the record.

Specifically, the decision states that the ALJ gave the Claimant "the benefit

of the doubt" and accepted his complaints regarding his inability to concentrate.  R.

30.  She found the Claimant's most recent progress note from December 1, 2010 also

supported her conclusion regarding the Claimant's moderate concentration

limitations because that record indicated the Claimant's attention, concentration,

and calculation were fair.  R. 29.  The ALJ continued by stating that she gave Dr.

Pedemonte's opinion regarding the Claimant's "*marked* limitations in concentration,

persistence, or pace" little weight since "the medical record did not support these

limitations."  R. 29 (emphasis added).  She explained that "marked limitations in

concentration, persistence, and pace indicate more than moderate limitation in the

Claimant's ability to complete even simple tasks" and this is contrary to the other

evidence in the record.  R. 29-30.  In light of this discussion, the Court finds the ALJ

appropriately explained the inconsistencies in the record with respect to the

Claimant's limitations in concentration and assessed the Claimant's RFC

accordingly. Accordingly , the Court rejects the Claimant's contention that the ALJ

failed to consider his limitations in concentration when she assessed his RFC.

The same is true with respect to the Claimant's limitations in anger management. The ALJ concluded that the Claimant had an RFC to perform a full range of work at all exertional levels but should not come into contact with the public for work related purposes and should have only occasional contact with co-workers and supervisors. R. 26. In making this determination, the ALJ referenced the opinion of psychiatrist Barbara Sherman. R. 30. She noted that Dr. Sherman diagnosed the Claimant with intermittent explosive disorder and expressly mentioned the Claimant's statements regarding his anger and the fact that the Claimant stated that when he gets angry he will "yell, break things, punch walls, and throw glass." R. 30. The ALJ found Sherman's assessment "consistent with her clinical findings" and determined that Sherman's conclusions regarding the Claimant's limitations did not limit him from all work. The ALJ accounted for this limitation as well as the Claimant's self-proclaimed "inability to take directions from others" by limiting the Claimant to work that required only "occasional contact with co-workers and supervisors." R. 26. Thus, the Court does not find the ALJ failed to consider the Claimant's limitations in anger management when she assessed his RFC.

As further support, the ALJ's RFC assessment is consistent with the medical records from psychiatrist Lionel Hudspeth. *See* R. 456-462. Dr. Hudspteth performed a mental RFC assessment on the Claimant in November 2009. R. 456-462. In making his assessment, Dr. Hudspeth reviewed and analyzed the Claimant's medical record and concluded that the Claimant's restrictions in

maintaining concentration and social functioning were mild.  R. 456.  Dr. Hudspeth

opined that the Claimant had "skills sufficient for at least two to three step tasks"

and would "be best served by having no contact with the public and minimal contact

with coworkers and supervisors."  R.  462.  This supports the ALJ's RFC assessment

and shows  that any error regarding the ALJ's failure to discuss all of the

Claimant's limitations or all of the evidence regarding the Claimant's limitations is

harmless.  *See Mueller v. Astrue*, 860 F. Supp. 2d 615, 638-39 (N.D. Ill. 2012)

(noting that it is harmless error not to address a limitation when the record

supports an ALJ's RFC finding).  Accordingly, the Court concludes that the ALJ

considered the Claimant's limitations in concentration and anger management

when she assessed his RFC.

    2.  The ALJ Failed to Provide the VE with a Complete Hypothetical at the
Administrative Hearing

The Claimant argues the ALJ failed to present the VE with an accurate

hypothetical because the ALJ failed to expressly mention the Claimant's limitations

in concentration and anger management.  The Claimant contends these omissions

caused the VE to give an inaccurate response with respect to the jobs that the

Claimant could perform.

"The hypothetical that an ALJ poses to a VE 'ordinarily must include all

limitations supported by medical evidence in the record' including limitations

imposed by depression."  *Patty v. Barnhart*, 189 Fed. Appx. 517, 521 (7th Cir. 2006)

(quoting *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002)).  However, the

hypothetical does not need to include all of the applicant's alleged impairments or

subjective complaints. *Id.* (citing *Jones v. Shalala*, 10 F.3d 522, 525 (7th Cir. 1993); *Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 540-41 (7th Cir. 1992)). An ALJ can rely upon a VE's response to an incomplete hypothetical "[w]hen the record supports the conclusion that the vocational expert considered the medical reports and documents." *Ehrhart*, 969 F.2d at 540.

In this case, the ALJ's hypothetical asked the VE to consider an individual like the Claimant with respect to age, education, and work experience, "who should come in no contact with the public for work-related purposes, but can come in occasional contact with coworkers and supervisors . . . and would be limited to unskilled, three - to four - step, simple, repetitive, routine tasks." R. 57-58. The ALJ inquired whether jobs were available for such an individual. R. 58.

The Claimant contends this hypothetical is incomplete because it failed to present the VE all of the Claimant's limitations. The Claimant particularly takes issue with the instruction which limited his work to "simple, repetitive routine tasks." R. 58. He contends this instruction cannot serve as a substitute for including the specific language regarding the Claimant's limitations in concentration, pace, and persistence. The Commissioner responds that this language is unnecessary because there is evidence that VE reviewed the medical record and heard the Claimant's testimony regarding his alleged limitations in concentration, pace, and persistence.

After reviewing the record, albeit a close call, the Court concludes that there is insufficient evidence to support the Commissioner's contention. Although the

hearing transcripts seem to suggest the VE was present for the entire administrative hearing and heard the Claimant's testimony regarding his limitations in concentration, the evidence is not entirely clear. *See* R. 41-57. At the administrative hearing, the Claimant testified that he had difficulty concentrating and focusing. R. 48. However, during the VE's testimony the ALJ only asked the VE whether she "reviewed exhibits and heard testimony regarding the Claimant's *work history*." R. 57 (emphasis added). This lack of clarity could have been avoided had the ALJ not asked a leading question. Simply asking the ALJ what she relied upon and then following up that question with a several simple, non-compound questions may have avoided this remand. The record is void of any evidence that indicates the VE had reviewed the Claimant's medical history and was familiar with his limitations before she answered the ALJ's hypothetical. Because of this, the Court finds the ALJ's hypothetical incomplete and concludes remand is warranted. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir 2010) (refusing to find a VE knew of an applicant's specific limitations in concentration because there was only evidence that the VE had heard testimony and reviewed evidence of the applicant's work history, not her medical history) s*ee also Dobrecevich v. Astrue*, 776 F. Supp. 2d. 878, 883 (E.D. Wisc. 2011) (remanding an applicant's social security appeal because the ALJ's hypothetical only stated that the applicant was limited to "simple, routine tasks," and the only evidence that the VE knew of the applicant's specific limitations was the fact that he had listened to the administrative hearing).

The Court also notes that this case does not fall within the second exception the Seventh Circuit has identified in which the exact language of concentration, persistence, or pace is unnecessary. *See O'Connor*, 627 F.3d at 619. In *O'Connor*, the Seventh Circuit explained that the an ALJ's hypothetical which omits the terms of concentration, persistence and pace can stand if it is "manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *Id.* This exception is inapplicable as the phrase "simple, repetitive, routine tasks" does not manifestly exclude tasks that someone with moderate limitations in concentration and focus arising from major depressive disorder and intermittent explosive disorder could perform. *See White v. Astrue,* 820 F. Supp. 2d 839, 841-51 (N.D. Ill. 2011) (finding the ALJ did not adequately explain how she accounted for Claimant's limitations in concentration, persistence and pace by limiting Claimant only to simple, repetitive tasks in the hypotheticals posed to the VE); *but see Arnold v. Barnhart*, 473 F.3d 816, 820-23 (7th Cir. 2007) (upholding a hypothetical that omitted the specific language of concentration, persistence, or pace, but included language that restricted the applicant to low-stress, low-production work because the applicant's limitations in concentration, persistence, and pace arose from stressed-induced headaches, frustration, and anger). The hypothetical here cannot be saved by the second exception and is therefore incomplete.

The hypothetical also appears deficient because the ALJ failed to include express language regarding the Claimant's limitations in anger management.

While the hypothetical included language regarding the Claimant's inability to come into contract with the public and his ability to only have occasional contact with supervisors and co-workers, it fails to mention the Claimant's limitations in anger management. Similar to the Court's reasoning regarding the omission of the terms "concentration, persistence, or pace," the Court finds this omission also supports remand. The Court acknowledges that the Claimant's attorney asked the VE generally about an employer's tolerance "with what we see in the record . . . of someone who would be getting angry to the point of being verbally abusive, screaming, and cursing . . . ." R. 59-60. However, this question was posed after the VE had responded to the ALJ's hypothetical and stated that the Claimant could perform a variety of jobs. R. 59-60. Thus, it is unclear whether the VE considered the Claimant's limitations in anger management when she stated that the Claimant could perform a number of jobs.

The Court finds *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004) provides additional support with respect to this issue. In *Young,* the Seventh Circuit remanded an applicant's appeal for benefits after it determined the ALJ failed to include all of the necessary limitations in the hypothetical posed to the VE. *Id.* at 1003-05. There, the Seventh Circuit first found that it was not possible to assume the VE had knowledge of the Claimant's limitations and used that knowledge in responding to the ALJ's hypotheticals because the ALJ "took a different approach to the hypothetical question and decided to ask the vocational expert a series of hypothetical questions with increasingly debilitating limitations."

*Id.* at 1003. The court reasoned that the hypothetical questions presented were flawed because they "made short shrift of the applicant's social and temperamental impairments." *Id.* at 1004.

The ALJ's questioning here is similar (albeit not identical) to the questioning in *Young*. In this case, the ALJ presented a hypothetical to the VE which asked whether an individual with the Claimant's characteristics and RFC could perform any jobs. R. 57-58. After the VE answered the question affirmatively, the ALJ continued to ask the VE additional questions with more restrictive limitations. *See* R. 58-59. This similar to the questioning in *Young*, because it appears as though the VE "was instructed to stick with the particular facts of the hypothetical along with the claimant's age, education, and work history." *Young*, 362 F.3d at 1003. Accordingly, the Court finds the ALJ's failure to include the Claimant's limitations in anger management also supports remand. *See id.* at 1005 ("when the hypothetical question is fundamentally flawed because it is limited to the facts presented in the question and does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand.").

3. The Court Declines to Address the Claimant's Credibility Arguments

Finally, the Claimant argues the decision of the ALJ should be reversed or remanded because the ALJ failed to properly assess his credibility. He claims that the ALJ placed too much emphasis on the gap in medical treatment and his ability

to care for his children when the ALJ determined the Claimant's limitations were not as severe as he alleged.  R. 28.

The Court notes the great deference typically afforded to an ALJ's credibility determinations, but declines to address this argument since the Court has already determined remand is warranted for the reasons stated above.  *See Elder v. Astrue,* 529 F.3d 408, 413-14 (7th Cir.2008) (stating that "only when the ALJ's credibility determination lacks any explanation or support . . . will we declare it to be patently wrong.").

## IV. CONCLUSION

For the reasons stated above, the Commissioner's motion for summary judgment is denied, and the Claimant's motion for summary judgment is granted. The Court remands this case to the Social Security Administration for further proceedings consistent with this Memorandum Opinion and Order.


It is so ordered.


Entered: February 6, 2014

**Iain D. Johnston**
**U.S. Magistrate Judge**